USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JUL 19 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
:       12 Civ. 4599 (AJN)
:       12 Civ. 5046 (AJN)
IN RE GMR SECURITIES LITIGATION          :
:       MEMORANDUM &
:       ORDER
:
------------------------------------------------------------------X

ALISON J. NATHAN, District Judge:

Plaintiffs, purchasers of General Maritime Corporation stock from May 10, 2010 to November 16, 2011, bring this putative class action alleging violations of § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b–5. They contend that individual defendants John P. Tavlarios, Jeffrey D. Pribor and Peter C. Georgiopoulos are liable for these alleged violations not simply as primary violators but also as "control persons" pursuant to § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Before the Court is Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, Defendants' motion is GRANTED.

I. **LEGAL STANDARD**

A court considering a motion to dismiss under Rule 12(b)(6) must assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere conclusory statements in a complaint and "formulaic recitation of the elements of a cause of action" are insufficient. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

1

*Id.*

In securities fraud cases, the Private Securities Litigation Reform Act requires a complaint to "specify each statement [or omission] alleged to have been misleading, the reason or reasons why the statement [or omission] is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Rule 9(b) of the Federal Rules of Civil Procedure, which applies to allegations of fraud, imposes a comparable requirement. *See* Fed.R.Civ.P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

When evaluating the sufficiency of the pleadings, the Court considers not only the factual allegations of the complaint itself, but also documents attached to the complaint as exhibits or incorporated by reference in the complaint. *Halebian v. Berv*, 644 F.3d 122, 131 n. 7 (2d Cir. 2011); *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 234 (2d Cir. 2008).

## II.  FACTUAL BACKGROUND

Defendants John P. Tavlarios, Jeffrey D. Pribor and Peter C. Georgiopoulos are executives at General Maritime Corporation ("GMC"). GMC is an international seaborne transportation services provider for crude oil and petroleum products, operating a fleet of over 30 vessels located throughout the world. (CAC ¶ 24; Pribor Decl. ¶ 7) GMC's vessels are used by third party customers either through "time charters" for specified charter periods or through "spot market" charters for specific, individual voyages. (Pribor Decl. ¶ 7) GMC manages deployment of its vessels between these two types of arrangements; vessels operating in the spot market usually generate increased profit margins, while vessels operating on time charters generally provide more predictable cash flows. (CAC ¶ 25)

On November 17, 2011, GMC filed for bankruptcy. (CAC ¶ 29) On that same day, Mr. Pribor, GMC's Chief Financial Officer, submitted a sworn declaration to the United States Bankruptcy Court in the Southern District of New York. (CAC ¶ 29) The declaration stated, in sum and substance, that for the past three years demand for oil transportation services had decreased while the supply of crude oil tankers had increased, causing charter rates for crude oil tankers to plummet. (CAC ¶ 30) On November 18, 2011, GMC issued a 10-Q, which also indicated that the weakening demand for oil transportation services combined with an oversupply of tankers had caused charter rates to weaken, directly and adversely affecting GMC's operating results. (CAC ¶ 32)

Plaintiffs, purchasers of GMC stock from May 10, 2010 to November 16, 2011 (the "Class Period"), initiated this action alleging that Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 by failing to disclose, in either a 10-Q or 10-K issued during the Class Period, that an oversupply of tankers combined with a decreased demand for oil tanker services was causing charter rates to weaken. (CAC ¶¶ 2, 12-14, 49, 53, 69)

### III. DISCUSSION

Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b-5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b–5(b).

"In a typical § 10(b) private action 'a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465 (2d Cir. 2013) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). Defendants move to dismiss Plaintiffs' § 10(b)/Rule 10b-5 claim on the grounds that Plaintiffs have failed to plausibly allege a material omission, scienter, and loss causation. Defendants further contend that Plaintiffs' § 20(a) claim must be dismissed in light of Plaintiffs' failure to allege a § 10(b)/Rule 10b-5 violation. For the reasons that follow, the Court agrees that Plaintiffs have failed to plausibly allege a material omission and that, as a result, Plaintiffs' § 10(b)/Rule 10b-5 and § 20(a) claims must be dismissed.

### A. No Material Omission

An omission is not actionable under § 10(b) unless the defendant was subject to an underlying duty to disclose. *Levitt*, 710 F.3d at 465. Here, Plaintiffs identify a single source for Defendants' alleged disclosure obligation: Item 303 of SEC Regulation S-K. Subsection (a)(3)(ii) of Item 303 requires a registrant to "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Similarly, subsection (a)(1) of Item 303 requires a registrant to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." 17 C.F.R. § 229.303(a)(1).

Instruction 3 to Item 303(a) provides that "[t]he discussion and analysis shall focus

specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." 17 C.F.R. § 229.303(a) instruction 3.

The SEC has described Item 303 as imposing a disclosure duty "where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989).

Plaintiffs contend that, pursuant to Item 303, Defendants were obligated to disclose "known trends" such as "plummeting charter rates, an oversupply of tankers, and a corresponding softening demand for [General Maritime's] tankers services" in GMC's 10-K and 10-Qs filed during the Class Period   (CAC ¶ 34, 38, 39)  They contend that that GMC's August 9, 2010 10-Q, November 9, 2010 10-Q, March 30, 2011 10-K, May 10, 2011 10-Q, and August 8, 2011 10-Q were "materially false and misleading because . . . the true facts, which were known by Defendants but concealed from the investing public, were that since at least 2008, the Company suffered from weakening charter rates due to the increased supply of oil tankers and decreased demand for oil tanker services.  By concealing these significant downward macro-trends – which, in turn, caused [GMC's] liquidity levels top plummet – Defendants failed to adequately disclose the magnitude of risk associated with investments in the [GMC's] common stock and failed to disclose known trends and uncertainties that would have a materially unfavorable impact on income from continuing operations."  (CAC ¶¶ 49, 53, 69, 80, 90)

5

Defendants do not contest that Item 303 creates a disclosure duty.[1] Instead, they contend that Plaintiffs have failed to plausibly allege that this duty was violated. More specifically, Defendants assert that GMC's 10-Qs and 10-K issued during the Class Period complied with the requirements of Item 303 and *did* disclose weakening charter rates and their effect on GMC's revenues. The Court agrees.

GMC's May 10, 2010, August 9, 2010, and November 9, 2010 10-Qs not only disclosed that GMC was suffering net losses, but also specifically identified lower time charter rates as the cause of decreases in net voyage revenues. (Afuses Decl. Ex. Q at pp. 23, 26; Ex. HH at p. 25, 28, Ex. R at pp. 4, 30, 34)

GMC's March 30, 2011 10-K contained even more explicit disclosures regarding the risks associated with GMC's business. (Afuses Decl. Ex. P) The most salient disclosures are reproduced below:

> Net voyage revenues decreased by $55.9 million or 19.2% . . . for the year ended December 31, 2010 . . . primarily due to a large number of vessels that were on time charter during 2009 *at higher rates that expired in 2010* at which time the vessels either entered into new time charters or went on the spot market *at lower rates*.

(Afuses Decl. Ex. P at p. 1) (emphasis added)

> "Our cash resources alone are not sufficient for us to meet our obligations during the coming year . . . . Furthermore, we believe that it is probable, absent amendments or waivers to our credit facilities or obtaining additional financing, that we will not comply with the Net Debt-to-EBITDA maintenance covenants under our 2005 Credit Facility and 2010 Credit Facility at or prior to the fourth quarter of 2011, and we may not be able to continue to comply with the minimum cash balance covenant *due to continued weakness in charter rates* and/or the timing of receipt of payments and required expenditures, in each case without additional financing or a waiver or amendment of the credit facilities. . . . *We continue to be subject to a difficult charter rate environment, which has negatively impacted our cash flow from operations.* Our independent registered public accounting

---

[1] In both *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011) and *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114 (2d Cir. 2012), the Second Circuit held that Item 303 creates a disclosure obligation. The Court notes, however, that both *Litwin* and *Panther Partners* were § 11 cases, not § 10(b) cases. Nonetheless, because § 11 contains a comparable material omission requirement, courts in this district have held that Item 303 creates the requisite disclosure obligation for a § 10b claim. *See Stratte-McClure v. Morgan Stanley*, No. 09 Civ. 2017, 2013 WL 297954, at *5 n.3 (S.D.N.Y. Jan. 18, 2013).

firm has indicated in their report, set forth below in "Item 8. Financial Statements and Supplementary Data", that these matters raise *substantial doubt about the Company's ability to continue as a going concern.* We are seeking additional liquidity through potential amendments or refinancings of our existing credit facilities and/or issuances of debt or equity."

(Afuses Decl. Ex. P at p. 1) (emphasis added)

**The current global economic turndown may negatively impact our business.**

In recent years, there has been a significant adverse shift in the global economy, with operating businesses facing tightening credit, weakening demand for goods and services, deteriorating international liquidity conditions, and declining markets. Lower demand for tanker cargoes as well as diminished trade credit available for the delivery of such cargoes have created *downward pressure on charter rates.* If the current global economic environment persists or worsens, we may be negatively affected in the following ways:

- We may not be able to employ our vessels at charter rates as favorable to us as historical rates or operate our vessels profitably.

- The market value of our vessels could decrease significantly, which may cause us to recognize losses if any of our vessels are sold or if their values are impaired. In addition, such a decline in the market value of our vessels could prevent us from borrowing under our credit facilities or trigger a default under their covenant.

- Charterers could seek to renegotiate the terms of their charters with us or have difficulty meeting their payment obligations to us.

If adverse conditions in the global economy or the global credit markets or volatility in the financial markets continue or worsens, we could experience a material adverse impact on our results of operations, financial condition and cash flows, and the market price of our common shares could decline.

(Afuses Decl. Ex. P at p. 15) (emphasis added)

**The cyclical nature of the tanker industry may lead to volatility in charter rates and vessel values which may adversely affect our earnings.**

If the tanker market, which has historically been cyclical, is depressed in the future, our earnings and available cash flow may decrease. Our ability to employ our vessels profitably will depend upon, among other things, economic conditions in the tanker market. Fluctuations in charter rates and tanker values result from changes in the supply and demand for tanker capacity and changes in the supply and demand for petroleum and petroleum product.

The factors affecting the supply and demand for tankers are outside of our control, and the nature, timing and degree of changes in industry conditions are unpredictable. The current global financial crisis has intensified this unpredictability.

7

> The factors that influence demand for tanker capacity include:
>
> • supply of and demand for petroleum and petroleum products;
>
> [. . .]
>
> • changes in seaborne and other transportation patterns, including changes in the distances over which tanker cargoes are transported by sea;
>
> • current and expected purchase orders for tankers;
>
> • the number of tanker newbuilding deliveries;
>
> • the scrapping rate of older tankers;
>
> • conversion of tankers to other uses or conversion of other vessels to tankers;
>
> [. . .]
>
> • tanker freight rates, which are affected by factors that may affect the rate of newbuilding, scrapping and laying up of tankers;
>
> [. . .]
>
> The recent global economic crisis may *further reduce* demand for transportation of oil over long distances and supply of tankers that carry oil, which may materially affect our revenues, profitability and cash flows.

(Afuses Decl. Ex. P at pp. 15-16) (emphasis added)

> **Spot market rates for tanker vessels are highly volatile and are currently at relatively low levels historically and may further decrease in the future, which may adversely affect our earnings in the event that our vessels are chartered in the spot market.**
>
> [. . .]
>
> The spot market is highly volatile, and, in the past, there have been periods when spot rates have declined below the operating cost of vessels. *Currently, charter hire rates are at relatively low rates historically and there is no assurance that the crude oil and product tanker charter market will recover over the next several months or will not continue to decline further.*

(Afuses Decl. Ex. P at p. 16) (emphasis added)

> **Charter rates for vessels may decrease in the future, which may adversely affect our earnings and ability to pay principal, premium, if any, and interest on our indebtedness.**
>
> We anticipate that future demand for our vessels, and in turn our future charter rates, will be affected by the rate of economic growth in the world's economy as well as seasonal

and regional changes in demand and changes in the capacity of the world's fleet. As of December 31, 2010, five of our 16 time charter contacts will expire prior to June 30, 2011. If the tanker industry, which has been highly cyclical, *continues to be depressed* in the future when our charters expire or at a time when we may want to sell a vessel, our earnings and available cash flow may be adversely affected. We cannot assure you that we will be able to successfully charter our vessels in the future or renew our existing charters at rates sufficient to allow us to operate our business profitably, meet our obligations including payment of debt service to our lenders. Our ability to renew the charters on our vessels on the expiration or termination of our current charters, the charter rates payable under any replacement charters, and vessel values will depend upon, among other things, economic conditions in the tanker industry at that time, changes in the supply and demand for vessel capacity and changes in the supply and demand for be seaborne transportation of crude oil.

(Afuses Decl. Ex. P at pp. 16-17) (emphasis added)

**An over supply of new vessels may adversely affect charter rates and vessel values.**

If the number of new ships delivered exceeds the number of tankers being scrapped and lost, tanker capacity will increase. In addition, *we believe that the total newbuilding order books for Suezmax vessels and Aframax vessels scheduled to enter the fleet through 2012 currently are a substantial portion of the existing fleets and we cannot assure you that the order books will not increase further in proportion to the existing fleets. If the supply of tanker capacity increases and the demand for tanker capacity does not increase correspondingly, charter rates could materially decline and the value of our vessels could be adversely affected.*

(Afuses Decl. Ex. P at p. 17) (emphasis added)

Finally, GMC's May 10, 2011 10-Q disclosed a decrease in net voyage revenues as the result of lower time charter rates and noted that lower time charter rates was partially the result of "a weaker rate environment." (Afuses Decl. Ex. II at p. 34)

In light of these disclosures, Plaintiffs argument that *"not a single Form 10-Q or 10-K filed during the Class period* disclosed *any* information concerning the oversupply of tankers in the marketplace and the ramifications associated with such an oversupply," (Opp. 11) (emphasis in original), is patently wrong. GMC's March 30, 2011 10-K warned about the volatility in charter rates and indicated that an increase in the supply of tankers, if not paired with increased demand for transport services, would have a direct impact on such rates, (Afuses Decl. Ex. P at

9

pp. 15-16); it warned about spot market rates falling to historically low levels and uncertainty as to whether these rates would recover or would instead decline further, (Afuses Decl. Ex. P at p. 16); it warned that a number of GMC's time charter contracts were set to expire and that if charter rates did not increase, GMC's earnings and available cash flow could be adversely affected, (Afuses Decl. Ex. P at pp. 16-17); and it warned that tanker capacity could increase and that, if demand for tanker capacity did not increase correspondingly, charter rates could materially decline and the value of GMC's vessels could be adversely affected, (Afuses Decl. Ex. P at p. 17). Furthermore, GMC repeatedly disclosed that charter rates were in decline, causing GMC's net voyage revenue to suffer and negatively impacting GMC's cash flow. (Afuses Decl. Ex. Q at pp. 23, 26; Ex. HH at p. 25, 28, Ex. R at pp. 4, 30, 34; Ex. II at p. 34; Ex. P at pp. 1, 16-17)

Plaintiffs appear to argue that the above-referenced disclosures are insufficient because they were not expressed with certainty, instead employing terms like "if" and "could." (Opp. 13) According to Plaintiffs, Defendants were required to disclose "that there was *in fact*, an increased supply of oil tankers currently in the market, and that together with decreased demand for oil tanker services, charter rates for crude oil transport vessels were, *in fact*, plummeting." (*Id.*) (emphasis in original) In other words, they were required to disclose that "[t]hese were observed, rather than merely potential outcomes." (*Id.*) However, as already demonstrated, GMC disclosed that charter rates were, in fact, depressed and that this was, in fact, harming GMC's operations. (Afuses Decl. Ex. Q at pp. 23, 26; Ex. HH at p. 25, 28; Ex. R at pp. 4, 30, 34; Ex. II at p. 34; Ex. P at pp. 1, 16-17)

In sum, Plaintiffs have failed to plausibly allege an actionable omission. As a result, their § 10(b)/Rule 10b-5 is dismissed.

### B. No Control Person Liability

If, as is the case here, the plaintiffs' control person liability claims under § 20(a) are predicated on a primary violation of the securities laws, and the primary violation claims have been dismissed, then the control person liability claims must also be dismissed. *See Sissel v. Rehwaldt*, No. 12-952, 2013 WL 2372296, at *3 (2d Cir. June 03, 2013) (finding, with respect to § 20(a) claims, that "[b]ecause the primary securities claims were dismissed, these secondary claims must also be dismissed."); *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 778 (2d Cir. 2010) (district court properly dismissed § 20(a) claim because "in order to establish a prima facie case of liability under § 20(a), a plaintiff must show a primary violation by a controlled person."); *Rombach v. Chang*, 355 F.3d 164, 178 (2d Cir. 2004) (same). Accordingly, Plaintiffs' § 20(a) claims are dismissed.

## IV. CONCLUSION

For the forgoing reasons, Defendants' motion to dismiss is GRANTED. The Clerk of the Court is directed to terminate this action.

SO ORDERED.

Dated: July 19, 2013
New York, New York

_____
ALISON J. NATHAN
United States District Judge